# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| ANDREW NIEMEIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:17 CV 2560 DDN |
| | ) | |
| ASSUREDPARTNERS OF MISSOURI, LLC, | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER SUSTAINING PLAINTIFF'S MOTION REGARDING EXPERT TESTIMONY AND REPORT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This action is before the Court on the motions of defendant AssuredPartners of Missouri, LLC, for summary judgment (Doc. 40) and the motion of plaintiff Andrew Niemeier to exclude the expert testimony and report of Lewis E. Melahn (Doc. 43). A hearing was held on the motions on January 25, 2019.

## I. MOTION FOR SUMMARY JUDGMENT

The following facts are uncontroverted for purposes of the motion for summary judgment, unless otherwise noted. Plaintiff Andrew Niemeier was hired by defendant AssuredPartners of Missouri, LLC, on June 28, 2016. (Docs. 42 and 53, ¶ 1). At that time, plaintiff had Life & Health and Property & Casualty insurance licenses, allowing him to sell those insurance products, including employee benefits ("EB") products. (*Id.* at ¶ 2). He understood his employment agreement prohibited him from making comments that could damage or disparage AssuredPartners. (*Id.* at ¶ 5). Defendant's Employee Handbook does not refer to the Missouri Insurance Producers Act or insurance producer licensing. (Docs. 53 and 61, ¶¶ 3-4).

The parties agree that insurance brokers or "producers" can be licensed to sell more than one type of insurance, but AssuredPartners producers primarily focus on either EB, Property & Casualty, or personal lines. They are expected to have a license in their focus area, and plaintiff admitted that if he had to choose, he would focus on EB. (*Id.* at ¶¶ 6-10). At AssuredPartners, if

more than one person was responsible for selling a deal, producers could split the commissions in a practice called "joint venturing," but there was no obligation to split commissions when the incoming business was under $5,000 and related to the focus area of the producer bringing in the business. (*Id.* at ¶¶ 11-13, 17). However, if a producer brought in business above $5,000 in revenue, AssuredPartners required that producer to coordinate with Lynne Scott, whose role was to service the needs of new and incoming business, to select an EB producer to "team sell" the business. (*Id.* at ¶¶ 15-16). This would then result in a commission split. (*Id.*). The producers are supported by a team of individuals to handle administrative needs in a practice called "team-selling," a practice used by plaintiff's prior two employers. (*Id.* at ¶¶ 20-22).

Defendant maintains that deals under the $5,000 revenue threshold would still need to be serviced by a broker licensed in that focus area, while plaintiff denies that the policy requires the producer sourcing the incoming business to be licensed in that focus area. (*Id.* at ¶¶ 17-18). Plaintiff testified that the policy "[d]oesn't allude to that at all," and "if you sourced a deal that, as it reads, [is] outside of your discipline and it fell below that $5,000 threshold, you were working directly with the team and I would assume you were compensated accordingly." (Doc. 53, Ex. 1 at 123). The company's "Producer Commission Splits Policy" states in relevant part:

> All Commercial P&C and Group Employee Benefits accounts less than $5,000 in revenue do not require producers to co-produce, regardless of discipline. All Commercial P&C accounts < [(under)] $5,000 will be managed through Penny Bailey. All Group Employee Benefits Accounts < $5,000 in revenue will be managed through Lynne Scott.

(Doc. 53 at Ex. 6).

In the fall of 2016, plaintiff observed co-workers Rick Frechmann, John Breslin, Chris Fox, and John Hensel discussing benefits coverage with prospective clients without possessing the requisite licenses, which plaintiff believed was illegal. (Docs. 42 and 53, ¶ 25). Plaintiff believes that general conversations regarding benefits coverage could be legal, but providing information on a "plan-specific" basis is illegal. (*Id.* at ¶ 23). Plaintiff also objected to Frechmann and Breslin receiving commissions for EB deals when not licensed in EB at the time of the deals. (*Id.* at ¶¶ 26-28). Plaintiff believed each of these co-workers engaged in illegal conduct by discussing EB coverages with multiple businesses when they were not licensed in EB. (*Id.* at ¶¶ 29-32). The specific actions are described as follows.

## A. Frechmann

Plaintiff claims that Frechmann, who was not licensed in EB when plaintiff was employed by AssuredPartners, discussed EB coverage with Lanter Distributing, Liviara, Total Access Urgent Care, Granny 8 Mortgage, and an unnamed business in Springfield, Missouri. (Docs. 42 and 53, ¶ 29). Frechmann brought the Lanter business in somehow, then worked with two EB-licensed producers, Chase Butler, and Scott, with plaintiff testifying that Butler "had not been involved after the sale" and that Frechmann was "continuing to give advice . . . to people at Lanter." (*Id.* at ¶¶ 36-37; Doc. 53, Ex. 1 at 180, 85). Frechmann received compensation for the Lanter EB revenue, with the parties disputing whether he split the commissions with the EB producers. (Docs. 42 and 53, ¶¶ 40-42).

With regard to Liviara, Frechmann approached plaintiff for assistance in bringing Liviara's EB business to AssuredPartners. (*Id.* at ¶ 43). The parties agree that Frechmann informed plaintiff he spoke with Liviara regarding its current EB manager and AssuredPartners' EB capabilities. (*Id.* at ¶ 44). However, plaintiff asserts that Frechmann further discussed data analytics related to EB plans that were not actually available to them, as well as the difference between "tweaking" the EB plan they already had versus new coverage. (*Id.*). The parties also dispute plaintiff's firsthand knowledge of these communications. (*Id.* at ¶ 45). Plaintiff claims Frechmann directly informed him of these conversations. (*Id.*). Then plaintiff was brought in and handled the EB side, after which point plaintiff admits Frechmann did not have any further improper communications with Liviara. (*Id.* at ¶ 50).

Frechmann also asked his Property & Casualty client, Total Access Urgent Care, if they would be interested in using AssuredPartners for EB needs. (*Id.* at ¶¶ 52-53). They agreed, and Frechmann and plaintiff had several conversations where plaintiff explained certain aspects of EB to Frechmann in advance of Frechmann's conversation with Total Access, but plaintiff was not a party to this conversation with Total Access or brought in for the Total Access pitch. (*Id.* at ¶¶ 53-57). However, Frechmann brought in other EB producers, Scott, Butler, and Hennessey, to land and manage Total Access's EB business. (*Id.* at ¶¶ 58-59). Plaintiff was not a party to any conversations with Total Access, nor did Scott tell plaintiff any details about the communications with Total Access, but plaintiff asserts that Frechmann told him he presented the option of being self-funded to Total Access, which plan may or may not have involved insurance. (*Id.* at ¶¶ 60-65).

With respect to Granny 8 Mortgage, the parties agree that Granny 8's CEO sent Frechmann an email inquiring whether AssuredPartners provided EB. (*Id.* at ¶ 66). The parties dispute what occurred next. Defendant claims Frechmann informed Granny 8 he would need to grab a teammate and then approached plaintiff to pitch to Granny 8. (*Id.* at 67). Plaintiff claims, however, that while Frechmann eventually informed Granny 8 that he should bring in a specialist, he did not approach plaintiff until after detailed conversations with Granny 8 about a specific disability insurance program, including provisions in the insurance policy and the definition of "disability." (*Id.* at ¶¶ 67-69). Plaintiff was not a party to Frechmann's conversation with Granny 8 but later went on a pitch with Frechmann to Granny 8 at Frechmann's request, where plaintiff led the EB discussions. (*Id.* at ¶¶ 70-72).

Finally, Frechmann informed plaintiff he had a conversation with an unnamed company in Springfield regarding EB, and then a second conversation with that company based on plaintiff's advice to Frechmann about technical aspects of EB. (*Id.* at ¶¶ 73-74). A Property & Casualty producer, Joleen Mayfield, assisted Frechmann with soliciting the Property & Casualty business, and the presentation would have discussed EB but "not in the traditional sense." (*Id.* at ¶¶ 78-79). Plaintiff was not present for either conversation and was not aware of whether a formal pitch was made or another EB producer was brought in, nor can plaintiff recall whether he saw the presentation to this company. (*Id.* at ¶¶ 75-76, 80). However, he asserts, based on his conversations with Frechmann, that Frechmann acted illegally by having technical conversations about EB with this company without an EB license. (*Id.* at ¶¶ 77, 81).

In the same month he learned of plaintiff's lawsuit, Frechmann obtained his EB licenses. (Docs. 53 and 61, ¶¶ 7-11). The parties agree he had received commissions on EB revenue despite not having life and health licenses. (*Id.* at ¶ 8). Frechmann testified that he had "been looking to get [the EB licenses] for a while," but he "kept putting it off" because he was too busy, but he "forced [his] schedule to open up for a period of time" in September 2017, shortly after this case was filed, in order to do so, because he "thought it was time." (*Id.* at ¶¶ 12-14).

**B. Breslin**

Plaintiff claims that Breslin, who was not licensed in EB when plaintiff was employed by AssuredPartners, discussed EB coverage with Great Clips, Slider House, and Bank of Washington. (Docs. 42 and 53, ¶ 30; Doc. 61, ¶ 6). Great Clips was a P&C client that reached out to Breslin for EB assistance. (Docs. 42 and 53, ¶ 83). Plaintiff asserts Breslin had illegal

conversations with Great Clips regarding EB coverage, though the parties agree plaintiff was not a party to these conversations. (*Id.* at ¶ 82). Breslin told Great Clips that AssuredPartners could assist with EB coverage and contacted plaintiff to handle the prospective EB business. (*Id.* at ¶ 84). Plaintiff attended multiple meetings and participated in multiple phone conversations with Great Clips during which Breslin did nothing illegal. (*Id.* at ¶¶ 85-87). Breslin sent an email to plaintiff stating "[t]his account has obviously become a stress and distraction for the both of us" and that it had "been a death by cuts." (Docs. 53 and 61, ¶ 47). He said he was going to "write a document to Robin and the team [at Great Clips] later today." (*Id.* at ¶ 49). The parties dispute who handled the policy rate negotiations with Great Clips. (Docs. 42 and 53, ¶ 89). Plaintiff received 50 percent of the EB commissions from Great Clips, while Breslin received the other 50 percent. Plaintiff claims that Breslin discussed compensation for services rendered to Great Clips and should not have received 50% of the commissions on EB products because he was not licensed in EB. (*Id.* at ¶¶ 88, 91).

With respect to Slider House, Breslin informed plaintiff he had been in communication with Slider House before asking plaintiff's help in bringing in their EB business, and these conversations "in a small way" discussed technical aspects of AssuredPartner's EB practice. (*Id.* at ¶ 93). Specifically, Breslin detailed AssuredPartner's ability to provide Affordable Care Act-compliant plans, though defendant denies that Breslin discussed ACA-compliant plans. (*Id.* at ¶¶ 94-95). Plaintiff was not present at the initial conversations but claims Breslin personally shared with him the details of these conversations with Slider House. (*Id.* at ¶ 94). Plaintiff did attend a later meeting with Breslin and Slider House, where plaintiff discussed EB and Breslin said nothing illegal. (*Id.* at ¶¶ 96-97).

Finally, Breslin engaged plaintiff in a deal with Bank of Washington early on, but a meeting never materialized. (*Id.* at ¶ 99). The parties agree that Breslin labelled the deal as an "EB deal" in AssuredPartners' system. (*Id.* at ¶ 98). Plaintiff claims and defendant disputes that Breslin told plaintiff he had detailed conversations with an individual at Bank of Washington about EB capabilities of AssuredPartners. (*Id.* at ¶¶ 98, 100-101).

**C. Fox**

Plaintiff claims that Fox discussed EB coverage with Natoli Engineering prior to obtaining his EB license. (*Id.* at ¶ 31). Plaintiff explained certain technical EB concepts and talking points to Fox, who then informed plaintiff that he had "at least" a phone conversation

with Natoli. (*Id.* at ¶ 102). Plaintiff was not present for this conversation but claims that based on his conversation with Fox after the Natoli phone call, he "felt" like Fox had spoken to Natoli about technical things surrounding EB, such as brokerage compensation and the premium Natoli was paying on its plan. (*Id.* at ¶¶ 103-06).

**D. Hensel**

Plaintiff claims that Hensel, who was not licensed in EB when plaintiff was employed by AssuredPartners, discussed EB coverage with Harley Davidson and Bender Construction. (*Id.* at ¶ 32). Plaintiff led the conversation with Bender, and Hensel said nothing illegal during the meeting. (*Id.* at ¶ 107). Plaintiff could not specifically identify any illegal actions taken by Hensel other than plaintiff believing that Hensel provided an illegal level of detail and improperly positioned himself about having EB expertise. (*Id.* at ¶ 106). However, plaintiff admitted he knew nothing specifically that Hensel said to either company that was illegal or that he suspected was in violation of the law. (*Id.* at ¶ 108).

**E. Other Allegedly Illegal Conduct**

Finally, plaintiff makes a variety of allegations regarding other co-workers' activities. He alleges that after he left, Carol Stojeba received commissions for a P&C deal when she was not licensed in P&C, though he did not know how she framed her conversation with the client. (*Id.* at ¶¶ 109-10). He also claims that Michael Behan was illegally paid on an EB deal without a license, but his only basis for this is that Behan was on the team for that client—which also was a P&C client. (*Id.* at ¶ 111).

AssuredPartners has an "open door policy" for reporting illegal activity to supervisors, human resources, or an "Ethics AlertLine" hotline, where employees should be able to voice any concern, for any reason, without fear of adverse action. (*Id.* at ¶ 113; Doc. 61, ¶ 54). Kearns stated that if an employee perceives that an activity is illegal, then the employee should report it. (Docs. 53 and 61, ¶ 52).

Plaintiff did not make a complaint to human resources or the ethics hotline, nor did he file a complaint with the Missouri Department of Insurance. (*Id.* at ¶ 117-18). Instead, he spoke with his supervisor, Nick Hejna, three times about his concerns. (*Id.* at ¶ 120). First, plaintiff raised the issue of Breslin's lack of license via text message in August or September 2016. (Docs. 42 and 53, ¶ 121; Docs. 53 and 61, ¶¶ 22-23). The text message stated: "how do we handle splitting EB revenue when the other producer isn't licensed? Breslin is P&C only."

(Docs. 42 and 53, ¶ 123). Hejna responded that Breslin would become licensed in EB before the end of the year. (Docs. 42 and 53, ¶ 125; Doc. 61, ¶ 23).

Second, in January 2017, plaintiff approached Hejna in person, complaining that Fox, Frechmann, and Breslin were "all out engaging in a level of soliciting business . . . without licenses" and that Breslin and Frechmann were not licensed in EB but receiving commissions on EB deals. (Docs. 42 and 53, ¶¶ 126-28). Plaintiff testified that Hejna "seemed to understand what [plaintiff] was saying" with regard to his reports of illegal conduct on the part of these producers. (*Id.* at ¶ 129). During this meeting, Hejna informed plaintiff that other employees were making comments about him. (*Id.* at ¶ 143).

Third, on February 15, 2017, plaintiff met with Hejna again, reporting that some producers were "breaking the law." (*Id.* at ¶ 132). Plaintiff believes and defendant does not dispute that he specifically mentioned Breslin and Frechmann, and plaintiff's objection that these producers were receiving commissions on EB deals when they were not licensed as EB producers. (*Id.* at ¶ 133). Hejna informed plaintiff that Scott had reached out to him that with regard to a specific client, she felt plaintiff was not involving her the way she thought plaintiff should, and that Scott wanted a fee agreement and wanted to know why plaintiff had not given it to her yet. (*Id.* at ¶ 144).

The parties dispute other alleged communications at this February meeting. Defendant claims that Hejna had received feedback from eight AssuredPartners employees that they were displeased with plaintiff's comments about his perception of the company's inadequacies. (*Id.* at ¶ 146). Defendant claims that Hejna warned plaintiff "this would be the last conversation [they] would have regarding [plaintiff's] attitude and approach to communicating with those in [AssuredPartners]. If further action is required, it will lead to termination." (*Id.* at ¶ 147). Plaintiff claims, on the other hand, that Hejna only informed him that he had received "feedback from people . . . around comments that [plaintiff] had made about, again, where the firm was headed, specific to why producers were still unlicensed when that was supposed to be remedied, and why in the employee benefits practice people – like Joe Hennessey and Carol Stojeba were still allowed to, in [plaintiff's] words, kind of do whatever they wanted that was outside of what we all agreed on with the new structure and how we were going to get things done." (*Id.* at ¶ 146). Plaintiff further claims Hejna did not suggest or state that it would be the last conversation they would have about this issue. (*Id.*).

Plaintiff did not report to Hejna concerns about Frechmann's intended conversations with a company regarding a self-funded plan option; instead, he only discussed that concern with Scott. (*Id.* at ¶¶ 134-35). Plaintiff testified that he had countless conversations with Scott about his belief that producers were violating the law. (*Id.* at ¶ 138). He also spoke with Jeff Mentel, a P&C producer and principal, and other employees about his concerns of illegal activity. (*Id.* at ¶¶ 139-41). Plaintiff sent an email to Scott stating "if Frechmann is going to have EB conversations, he needs to get licensed," and on August 2, 2017, Scott indicated to plaintiff that she sent Nick Hejna an email about this complaint. (Docs. 53 and 61, ¶ 15). The same day, plaintiff sent Scott another email including his concerns about producers being paid commissions "on business they aren't licensed to sell." (*Id.* at ¶ 16). Scott replied that Frechmann was "not going to get paid until he gets his license. Nick [Hejna] just confirmed it." (*Id.* at ¶ 17). Scott and plaintiff sent text messages to each other with concerns about Frechmann's activity with Lanter, because he did not have an EB license. (*Id.* at ¶¶ 18-19). Plaintiff alluded to the fact that by doing this Frechmann was breaking the law. (*Id.* at ¶ 20; Doc. 53, Ex. 14 at 2). Scott testified she would go to Nick Hejna and say Frechmann "probably needs to get a life and health license since he's continuing to prospect in this space." (Docs. 53 and 61, ¶ 21).

Shortly before plaintiff's termination, Mentel reported to Hejna that he had a conversation with plaintiff, and based on that conversation that Mentel relayed to Hejan, Hejna decided to fire plaintiff. (Docs. 42 and 53, ¶¶ 156-57). The parties dispute the content of this conversation. Defendant claims that Mentel told him plaintiff stood in his "doorway for a period of 30 to 40 minutes and told Jeff everything that was wrong with [Hejna], the firm, its people, its processes," while plaintiff claims that he stated to Mentel his concerns about conduct he believed to be illegal and that he was frustrated about producers continuing to be unlicensed, and certain employees doing whatever they wanted and not working as a team. (*Id.* at ¶ 156).

On August 14, 2017, Hejna called a meeting of Lynne Scott, Peggy Kearns, and the CFO of AssuredPartners to discuss plaintiff's behavior and their opinion on plaintiff's possible termination. (*Id.* at ¶ 158). The meeting attendees agreed that plaintiff's behavior justified termination. (*Id.* at ¶ 159).

On August 18, 2017, plaintiff was terminated, with Hejna informing him it was for insubordination and derogatory remarks. (*Id.* at ¶¶ 160-62). Although no one ever told him he was terminated for this reason, plaintiff claims he was terminated for reporting the illegal

conduct that producers were selling, soliciting, and negotiating insurance without the proper licenses. (*Id.* at ¶ 161-63). From March 1, 2017, through plaintiff's termination date of August 18, 2017, Hejna did not have any formal or informal conversations with plaintiff related to his attitude or other issues. (*Id.* at ¶ 46).

The parties agree plaintiff was in the top ten percent of producers within AssuredPartners nationwide. (Docs. 53 and 61, ¶ 31). He was the most knowledgeable EB producer with regard to ELAP, "was knowledgeable and professional in employee benefits," and "was good in front of clients and they had a comfort level with that." (*Id.* at ¶¶ 32, 33). According to Scott, he was "the only producer in benefits that had a clue[.]" (*Id.* at ¶ 34). Plaintiff claims that another employee was vocal to other producers and to Hejna about a quoting proposal format but was still employed by AssuredPartners as of October 29, 2018. (*Id.* at ¶¶ 35, 38). Defendant may use a Performance Improvement Plan ("PIP") to define issues it is having with an employee, state how defendant expects the employee to change the issues, and inform the employee when it wants those changes to be made, but plaintiff was never placed on a PIP. (*Id.* at ¶¶ 40-41).

Following plaintiff's termination, AssuredPartners employees provided statements regarding alleged inter-personal issues with plaintiff, but the parties dispute that these statements are an accurate representation of plaintiff's dealings and interactions with co-workers, clients, and prospective clients. (*Id.* at ¶¶ 148-53). None of the statements produced by defendant were prepared before plaintiff's termination, but all were prepared afterward, either in response to an HR request or after plaintiff filed the lawsuit. (Docs. 53 and 61, ¶ 42-43).

## DISCUSSION

Defendant argues that plaintiff, who brings a single claim for wrongful discharge in violation of public policy under Missouri law, was not actually a whistleblower. Defendant claims plaintiff did not witness any allegedly illegal act, the acts plaintiff complains of did not constitute violations of Missouri law or public policy, and plaintiff failed to properly report the allegedly wrongful conduct. Plaintiff responds that he need not prove the underlying conduct was actually illegal and that he did properly report the alleged misconduct to his supervisor.

### A. Legal Standard

Summary judgment is appropriate "if there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party." *Shrable v. Eaton Corp.*, 695 F.3d

768, 770 (8th Cir. 2012); *see also* Fed. R. Civ. P. 56(a). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The burden shifts to the non-moving party to demonstrate that disputes of fact do exist only after the movant has made its showing. *Id.* In this case the relevant facts are undisputed. All that is necessary is for the court to apply the law to those facts.

**B.     Applicable rules of decision**

This case was removed by defendant from the Circuit Court of St. Louis County, on the undisputed basis of diversity of citizenship subject matter jurisdiction, granted by 28 U.S.C. § 1332. For such a case, this Court looks to the applicable state substantive law for the rules of decision. 28 U.S.C. § 1652. The parties do not dispute that the substantive law of Missouri provides the substantive rules of decision for this case.

Under Missouri law, an at-will employee can generally be terminated for any reason or for no reason at all. *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 92 (Mo. 2010). However, there is a narrow public policy exception for an employee who demonstrates he was discharged "for reporting wrongdoing or violations of law to superiors or public authorities," or "whistleblowing." *Id.*

A recent opinion of the Missouri Supreme Court clarified much for the consideration of plaintiff's claim. The analysis of defendant's motion for summary judgment depends upon a correct understanding of the essential elements of plaintiff's cause of action. They are: (1) plaintiff reported to his superior at defendant a violation of a law, regulation, or statement of well-established and clearly-mandated public policy; (2) plaintiff was terminated from his employment by defendant; and (3) his report to his superior was a contributing factor in the decision to terminate him. *Newsome v. Kansas City, Mo. School Dist.*, 520 S.W.3d 769, 778-80 (Mo. 2017) (disapproving the use of a verdict director instruction derived from Missouri Approved Instruction (Civil) 38.03, which added to the cause of action the fact that plaintiff reasonably believed the reported act violated the law). *See also Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d at 95;     *Margiotta v. Christian Hosp.*, 315 S.W.3d 342, 346-47 (Mo. 2010); *Yerra, M.D., v. Mercy Clinic Springfield Communities,* 536 S.W.3d 348, 351 (Mo. Ct. App. 2017).

In any submission to a jury, the verdict director will not ask whether what the plaintiff reported was an act which was a violation of the law or of public policy or whether the plaintiff had a good faith belief that what was reported was an illegal act. *Id.* Rather the illegality or not of the act reported is an issue of law for the trial judge and whether plaintiff had a good faith belief in its illegality is totally irrelevant. *See Newsome*, 520 S.W.3d at 778-80. This legal issue is submitted to the Court in defendant's motion for summary judgment.

1. **Misconduct Violating the Law or Public Policy**

Plaintiff's claim must be based on the violation of a "constitutional provision, statute, regulation, or rule promulgated by a governmental body," with a clear mandate of public policy. *Margiotta*, 315 S.W.3d at 347. From the discussion above, plaintiff's argument that he need not prove that the reported actions were actually unlawful is without merit. The Court moves on to the legal sufficiency of the proffered evidence of the statements plaintiff made to his supervisor and whether they are sufficient as a matter of law to have reported illegal activity.

"[N]ot every statute or regulation gives rise to an at-will wrongful termination action." *Id.* at 346. "A vague or general statute, regulation, or rule cannot be successfully pled under the at-will wrongful termination theory, because it would force the court to decide on its own what public policy requires." *Id.* Generally, Missouri courts have reasoned that rules do not have a "clear mandate of public policy" if they do not provide notice of explicit legal obligations. *See, e.g., id.* (holding that reporting unsafe patient practices at a hospital did not reflect a clear mandate of public policy, because no definite statute, regulation, or rule clearly gave notice to the parties of its requirements); *see also Sivigliano v. Harrah's North Kansas City Corp.*, 188 S.W.3d 46, 49 (Mo. Ct. App. 2006) (affirming that a petition relying solely upon company policy does not cite an adequate legal provision and should be dismissed).

Under the Missouri Insurance Producers Act, insurance producers are prohibited from soliciting, negotiating, or selling insurance or receiving commissions for such without a license for that line of insurance. Mo. Rev. Stat. §§ 375.012, 375.076. These provisions are further defined by statute and regulation.

The Court concludes that the Missouri Insurance Producers Act is a source of regulation beyond internal company policy and constitutes clearly mandated public policy under Missouri law. Plaintiff's co-workers, as insurance brokers licensed under the very same statutory and regulatory scheme, cannot claim a lack of notice of their obligations under it. Furthermore, the

statutes and regulations provide against insurance activities that might harm the public—namely, receiving insurance advice from an unqualified broker and incentivizing misinformation. The Act provides specific, enforceable duties to support a clear mandate of public policy. *Cf. Graham v. Hubbs Mach. & Mfg., Inc.*, 92 F. Supp. 3d 935, 941–42 (E.D. Mo. 2015) ("The sources of authority in which public policy is found to support wrongful discharge are broad enough to encompass [Financial Industry Regulatory Authority] rules.").

The parties dispute material facts related to the co-workers' conduct and whether it violates the law. The Missouri Insurance Producers Act and its regulations provide the following definitions:

- "Soliciting" insurance is defined as "attempting to sell insurance or asking or urging a person to apply for a particular kind of insurance from a particular company. Mo. Rev. Stat. § 375.012(16). It does not include scheduling appointments, receiving information to transmit to a licensed producer, or general conversations where the terms of an insurance contract are not discussed. 20 C.S.R. § 700-1.020(1)(C). Nor does it include "disseminating buyer's guides, applications for coverage, coverage selection forms, or other similar forms." *Id.*

- "Negotiating" insurance is defined as "the act of conferring directly with or offering advice directly to a purchaser or prospective purchaser of a particular contract of insurance concerning any of the substantive benefits, terms or conditions of the contract, provided that the person engaged in that act either sells insurance or obtains insurance from insurers for purchasers." Mo. Rev. Stat. § 375.012(12). It does not include obtaining from the prospective policyholder "factual information necessary for an insurance producer to complete a review." 20 C.S.R. § 700-1.020(2)(C)

- "Selling" insurance is defined as "to exchange a contract of insurance by any means, for money or its equivalent, on behalf of an insurance company." Mo. Rev. Stat. § 375.012(15). It does not include receiving requests for insurance coverage to be transmitted to a licensed producer, nor does it include preparing an application for insurance pursuant to a licensed producer's instructions. 20 C.S.R. § 700-1.020(3)(C)

A person may only receive consideration for soliciting, negotiating, or selling insurance if he or she is licensed in that particular area of insurance. Mo. Rev. Stat. § 375.076.

Plaintiff claims his co-workers were soliciting, negotiating, and selling EB insurance without EB licenses and receiving commissions therefor. Such activity can support plaintiff's claim of wrongful termination, if he in fact reported such illegal activity to his employer. As a

matter of law, his claim may not rest on his reporting acts that fit the regulations' definition of what is not soliciting, negotiating, or selling.

## 2. Plaintiff's 3 Reports

Plaintiff must create a genuine issue of fact as to whether he reported one or more acts that violated the Missouri Insurance Producers Act, as defined by the regulations, to his employment superior. The parties agree that plaintiff never made a complaint through AssuredPartners' Ethics AlertLine hotline or to Human Resources, nor did he file a complaint with the Missouri Department of Insurance. (Docs. 42 and 53, ¶¶ 117-118). Plaintiff also did not make any complaint of retaliation for his reporting. (*Id.* at ¶ 119). The parties also agree that plaintiff had three conversations with his supervisor, Nick Hejna, about plaintiff's concerns that AssuredPartners producers, who are not licensed in EB, were providing information to prospective clients about EB insurance. (*Id.* at ¶ 120).

### Report 1: the Text Message

The first was via text message on August 11, 2016. Plaintiff described the text message conversation in his August 29, 2018 deposition thus:

> Q. You indicated that you had conversations with Mr. Hejna with respect to what you believe was improper that employees who were not licensed in health were providing information to prospective clients or clients, right?
>
> A. That's one of the things, yes.
>
> Q. Okay. Tell me how many different conversations did you have with Mr. Hejna?
>
> A. That I can recall and probably put to an approximate date, in person two times and via text message once.
>
> Q. When was the first conversation you had with Mr. Henja about any conduct that you believe that producers were engaging was improper or suspected was in violation of the law?
>
> A. So I believe that was shortly after or right around the time that John Breslin and I were hired by Great Clips, which I would imagine was August or September of 2016.
>
> Q. So -- so within a couple of months of your joining Assured Partners?
>
> A. Correct.

> Q. Was anyone else present for this conversation?
>
> A. That particular one was a text message.
>
> Q. Okay. And what was . . . the text message? What did it say?
>
> A. Yeah. So we were excited about the win. It was a good thing for the office. And I made a comment to Nick that I had found out during that process that John wasn't licensed. And it was my understanding that it was illegal to pay a producer on a fully insured commissionable product without the appropriate employee benefit-related licenses.
>
> And I said, Hey, we need to get John licensed if we're going to pay him.
>
> And he said that he would make sure that John was licensed before the end of the year, I believe is what he said. And at that point, I had no reason not to take Nick at his word.

(Doc. 42-1, Niemeier Dep., at 258-60).

The subject text message exhibit itself indicates that it was about several topics, including qualifying for a conference trip and plaintiff's commenting that producer John Breslin was not licensed in employee benefits:

> Niemeier: What are the other metrics?
>
> Also, how do we handle splitting EB revenue when the other producer isn't licensed? Breslin is P & C only.
>
> Hejna: Breslin needs to get his life (sic)
>
> Niemeier: In the meantime does all the credit go to me? If so, I'm at $75k.
> That aside, you should probably tell him how that works. Believe he may be under the assumption there's a way to split it as is.
>
> Henja: Ha. He's going to get by year end
>
> Niemeier: Better let him know !
>
> We're going to have another on board in 2 weeks. Prolly $15k EB
>
> Henja: So you're there. @ 75. Nice work. We need that.
>
> Niemeier: More to come

(Doc. 53-15).

Plaintiff's August 11, 2017 text message statement to Hejna is legally insufficient as a report to his superior that another insurance producer was violating the law. This is because, it is indefinite about what the underlying acts of Breslin were; they were not described as soliciting, negotiating, or selling for which he was being compensated. It is undisputed that defendant's producers were splitting fees across insurance areas, and the Missouri regulations describe many activities for which producers can be compensated that do not qualify as prohibited acts.

Reports 2 and 3: The in-person reports

The two in-person Niemeier-Hejna conversations occurred in January and February 2017. (*Id.* at ¶¶ 126, 130). At the January meeting, plaintiff reported that Fox, Frechmann, and Breslin were "all out engaging in a level of soliciting business . . . without licenses" and that Breslin and Frechmann were receiving commissions on the EB deal. (*Id.* at ¶ 128). Although he could not recall which of the specific illegal actions, detailed above, he reported, he remembered that Hejna "seemed to understand what plaintiff was saying." (*Id.* at ¶ 129). At the February meeting, the parties agree that plaintiff told Hejna some AssuredPartners producers were "breaking the law," and he believes he specifically mentioned Breslin and Frechmann receiving commissions on EB deals when they were not licensed as EB producers. (*Id.* at ¶¶ 132-33).

Defendant has not disputed plaintiff's recollection, though defendant emphasizes that plaintiff and Hejna were the only ones present at both in-person meetings. Instead, defendant claims that plaintiff's reports to Hejna were insufficient, because plaintiff implicated Hejna in condoning the illegal activity. However, this argument is without merit. The Court has not found any specific claim of illegal conduct against Hejna. If plaintiff had reported to Frechmann and Breslin, defendant's argument might be successful, but plaintiff reported the conduct to his immediate supervisor, Hejna, whom plaintiff did not allege to be involved in the purported wrongdoing. *Compare Dunn v. Enterprise Rent-A-Car*, 170 S.W.3d 1, 4 (Mo. Ct. App. 2005) (holding a plaintiff made a submissible claim when he reported to his immediate supervisor who was not involved in the purported wrongdoing) *with Scott v. Missouri Valley Physicians, P.C.*, 460 F.3d 968, 970 (8th Cir. 2006) (holding a plaintiff had not demonstrated a submissible claim when he reported concerns directly to the purported wrongdoers). Defendant has not shown that this element fails as a matter of law.

At trial, the Court will assess the specific evidence presented to the jury about the legal sufficiency of plaintiff's in-person reports to supervisor Hejna.

### 3. Contributing Factor

Finally, plaintiff must create a genuine issue of fact as to whether either or both of his in-person reports was a contributing factor in AssuredPartners' decision to terminate his employment. "A contributing factor is a condition that contributes a share in anything or has a part in producing that effect." *Minze v. Missouri Dept. of Public Safety*, 541 S.W.3d 575, 582 (Mo. Ct. App. 2017). This standard is less rigorous than the "motivating factor" or "exclusive cause" standards of other employment causes of action, but it is still a "causation" standard. *See, e.g., Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 94 (Mo. banc 2010); *Denn v. CSL Plasma, Inc.*, 816 F.3d 1027, 1033 (8th Cir. 2016). Under the contributing factor standard, it is immaterial whether defendant had other, non-retaliatory motives for its actions: "if [plaintiff's] protected activity was even one contributing factor in [defendant's] decision to take an act of reprisal against [plaintiff], then there was an unlawful retaliation." *Walsh v. City of Kansas City, Mo.*, 481 S.W.3d 97, 108 n.6 (Mo. Ct. App. 2016). A plaintiff need not present evidence of similarly-situated employees, but this type of evidence can give rise to a factual issue regarding whether a retaliatory reason was a contributing factor. *Denn*, 816 F.3d at 1034.

Plaintiff's in-person reports occurred in January February 2017. Six months later, in August 2017, he was terminated. Defendant argues that when so much time has passed between the protected activity and the termination, the Court cannot infer a causal connection, especially when there is substantial evidence in the record that plaintiff was actively undermining leadership and team efforts. (Docs. 42 and 53, ¶¶ 142-63). Defendant claims the six month period from the last report to the time of plaintiff's termination is too attenuated to establish causation, even as a contributing factor, especially when coupled with escalating interpersonal issues in the time period between the report and the termination.

However, after considering the evidence of record, including plaintiff's high performance, the lack of any written complaints until after plaintiff's termination, the lack of HR involvement or a PIP, and plaintiff's unique experience and knowledge within the office, the Court finds that plaintiff has proffered sufficient evidence that could allow a jury to conclude his report was a contributing factor in his termination.

Accordingly, defendant's motion for summary judgment is sustained as to the text message, but otherwise denied.

## II.     MOTION TO EXCLUDE EXPERT EVIDENCE

Plaintiff has moved to exclude the testimony and report of defendant's expert, Lewis F. Melahn.  (Doc. 43).  At the hearing held on January 25, 2019, on this motion, the Court orally denied the motion, with a written order to issue.  (Doc. 63).  As a consequence of the Court's determinations above regarding the issues for the Court and the issues for the jury at trial, the Court now vacates its oral ruling at the hearing and for the reasons set forth below sustains plaintiff's motion.

In diversity cases, federal law governs the admissibility of expert testimony.  *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005).  To be admissible, the proponent of the evidence must prove that the expert testimony is both reliable and helpful, and that the expert is qualified to be a witness.  Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note.  This showing must be made by a preponderance of the evidence.  *Bourjaily v. United States*, 483 U.S. 171, 176 (1987); *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).

Mr. Melahn's opinions can be summarized as follows:

1. It is permissible under Missouri insurance laws and regulations for an insurance producer licensed in Property & Casualty, but not in Life & Health, to receive commissions on Life & Health business written in the producer's agency when the producer does not engage in the solicitation, negotiation, or sale of the Life & Health insurance.

2. None of the activities of producers at AssuredPartners licensed in Property & Casualty referring clients for the sale of Employee Benefits insurance to other producers at AssuredPartners licensed in Employee Benefits constituted the sale, solicitation or negotiation of insurance under Missouri law.

(Doc. 44, Ex. 1).

Expert testimony on legal matters is generally inadmissible, as it is the Court's function to determine and instruct the jury on the applicable law.  *See S. Pine Helicotpers, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003).  The Court has reviewed Mr. Melahn's report in detail, and although Mr. Melahn has decades of experience working with producers of insurance and is a highly qualified insurance attorney, his expertise will not be helpful in this case.  First, his proffered opinions will be irrelevant to the factfinding by the jury. The jury will not be asked whether either or both of plaintiff's in-person reports to his supervisor were that his co-workers were violating the law.  The jury will be asked in part whether plaintiff in fact made the reports to his supervisor.  The legal sufficiency of the reports as reporting

violations of the law will be an issue for the Court at trial before the case is submitted to the jury. With all due respect to Mr. Melahn, an expert opinion on the law will not be necessary to the Court's determination in this regard.

### III.    ORDER

For the reasons stated above,

**IT IS HEREBY ORDERED** that the motion of defendant for summary judgment (Doc. 40) is **denied**.

**IT IS FURTHER ORDERED** that the motion of plaintiff to exclude expert opinion evidence of what is lawful and unlawful activity under the Missouri Insurance Producers Act and its related regulations (Doc. 43) **is sustained.**

　　　　　　　　　　　　　　　　/s/    David D. Noce　　　　　　　　
　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**

Signed on March 19, 2019.