**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| **ANDREW NIEMEIER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.:  4:17-cv-02560-DDN** |
| **v.** | ) | |
| | ) | |
| **ASSUREDPARTNERS OF** | ) | |
| **MISSOURI, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S TRIAL BRIEF**

COMES NOW Defendant AssuredPartners of Missouri, LLC ("AP"), and pursuant to the Court's Case Management Order (ECF Nos. 17, 34), hereby submits its Trial Brief.

**I.      STATEMENT OF THE CASE**

Plaintiff Andrew Niemeier ("Plaintiff") is a former insurance producer for AP who was terminated on August 18, 2017 for insubordination and derogatory remarks.  Plaintiff filed a single count Petition for wrongful termination in violation of public policy, also known as whistleblowing, which was removed to this Court.  He alleges his termination resulted from three reports he made to his supervisor over a six month period prior to his termination regarding conduct he believed violated Missouri's Insurance Producers Act ("IPA").  *See* ECF #29, Petition.  His claims all arise from a motor vehicle accident on August 12, 2016, wherein Plaintiff was driving a company van for his own personal use.  *See* ECF #4, Petition.

On November 21, 2018, AP filed its Motion for Summary Judgment (ECF #40) and Memorandum in Support (ECF #41) on Plaintiff's Petition.  On March 19, 2019, this Court issued its Memorandum Denying Defendant's Motion for Summary Judgment.  ECF #65.  In its

Order, this Court clearly established that the question of law concerning the legal sufficiency of Plaintiff's alleged complaints to Nick Hejna concerning purportedly unlawful activity of AssuredPartners' employees would be reserved for the Court and would not be presented to the jury. *See* ECF #65, p. 15.  In the Order, the Court also narrowed the alleged complaints made by Plaintiff to one asserted in a text message, and two in-person complaints in January and February 2017. *Id.*, pp. 13, 15.  The Court found that the text message complaint was "legally insufficient as a report to his superior that another insurance producer was violating the law" and reserved judgment as to the two in-person complaints.  *Id.*, p. 15.  Accordingly, the only alleged complaints at issue in this case are two in-person complaints Plaintiff purportedly made to Mr. Hejna more than six months before his termination.

## II.   INTRODUCTION

Plaintiff's whistleblower claim fails as a matter of law because he cannot establish a *prima facie* case for whistleblowing.  Specifically, Plaintiff did not report serious misconduct that constitutes a violation of the law to his superiors or third parties, and even if he had, his report was not a factor in the decision to discharge him.  As set forth below, Plaintiff did not witness any illegal activity because the conduct he complained of is not unlawful.  Furthermore, Plaintiff was terminated for his own abrasive and insubordinate conduct, wholly unrelated to his grievances concerning the conduct of other insurance producers.

## III.   PLAINTIFF'S WHISTLEBLOWER CLAIM

Missouri recognizes an extremely narrow public policy exception to the general rule that an at-will employee can be terminated for any reason or for no reason.  *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 92 (Mo. 2010).  Under this exception, an employee may have a cause of action for wrongful discharge if he demonstrates he was discharged "for reporting

wrongdoing or violations of law to superiors or public authorities," a claim also known as whistleblowing. *Id.* at 92. To prevail on a whistleblowing claim, an employee must establish: (1) he reported serious misconduct that constitutes a violation of the law, or of well-established and clearly mandated public policy, to his superiors or third parties; (2) his employer discharged him; and (3) such report was a contributing factor to the discharge. *Margiotta v. Christian Hosp.*, 315 S.W.3d 342, 346-47 (Mo. 2010); *Fleshner*, 304 S.W.3d at 94-95.

Plaintiff alleges AP retaliated against him after he purportedly blew the whistle on illegal activity when it terminated his employment. This claim fails as a matter of law because Plaintiff cannot establish a *prima facie* case for whistleblowing because there is no evidence that any AP producer engaged in illegal activity, Plaintiff did not blow the whistle, and Plaintiff's own abrasive and insubordinate conduct caused his termination such that his supposed "reports" had no bearing on the decision to terminate him.

### A.     No AP Producer Engaged in Illegal Activity.

A whistleblowing claim must be based on a "constitutional provision, statute, regulation, or rule promulgated by a governmental body." *Margiotta*, 315 S.W.3d at 347. "[N]ot every statute or regulation gives rise to an at-will wrongful termination action." *Id.* at 346. Therefore, Plaintiff must have demonstrated how the reported conduct violated the IPA. *Bazzi v. Tyco Healthcare Grp., LP*, 652 F.3d 943, 948 (8th Cir. 2011) ("[M]ere citation to [a law or regulation] *without a demonstration of how the reported conduct violated it* cannot form the basis for a wrongful discharge action.") (emphasis in original); *Frevert v. Ford Motor Co.*, 614 F.3d 466, 471 (8th Cir. 2010); *Jones v. Galaxy 1 Mktg., Inc.,* 478 S.W.3d 556, 563 (Mo. Ct. App. 2015). The pertinent inquiry "is whether the authority clearly prohibits the conduct at issue." *Margiotta*, 315 S.W.3d at 347. In this case, Plaintiff claims certain AP producers violated the

3

IPA, RSMo. §375.012 *et seq.*, which prohibits selling, soliciting, or negotiating insurance or receiving commissions without a license for that line of authority.  RSMo. §§375.014, 375.076.

### 1.    Plaintiff Witnessed No Illegal Activity.

As an initial matter, Plaintiff has no factual support for his allegations that AP producers – Mr. Frechmann, Mr. Breslin, and Mr. Fox – engaged in certain illegal conduct without the requisite licensing.  Cmplt., ¶15.  These are the only producers at issue in this case because this Court narrowed the alleged complaints made by Plaintiff to two in-person complaints in January and February 2017 concerning Mr. Frechmann, Mr. Breslin, and Mr. Fox.  *See* ECF #65, pp. 13-15.  When pressed during his deposition, Plaintiff could not articulate a single objective illegal action *he* witnessed concerning these three producers.   Indeed, Plaintiff had no firsthand knowledge of any allegedly illegal actions taken by Mr. Frechmann with respect to the Lanter Distributing, Liviara, Total Access Urgent Care, Granny 8 Mortgage, or the Springfield company accounts.  Similarly, Plaintiff admitted his belief that Mr. Breslin engaged in illegal conduct with respect to Great Clips or Slider House was not based on firsthand knowledge and he *assumed* Mr. Breslin acted illegally with respect to Bank of Washington because of how it was categorized in AP's system.   Finally, Niemeyer testified at his deposition that he did not participate in any of the conversations Mr. Fox may have had with Natoli Engineering.  Plaintiff's theories – not actual observations – provide the sole foundation for his accusations that Mr. Frechmann, Mr. Breslin, and Mr. Fox engaged in unlawful activity.  His lack of firsthand knowledge of alleged illegal activity eviscerates his whistleblower claim.

### 2.    Plaintiff's Belief that the AP Producers Violated the Law Cannot Support his Whistleblowing Claim.

Plaintiff's belief that AP producers engaged in illegal conduct is predicated on his own misinterpretation of the law, which cannot support a whistleblowing claim.   The Missouri

Supreme Court held protected status will not be provided to an employee for "making complaints about acts or omission he *merely believes* to be violations of the law."  *Margiotta*, 315 S.W.3d at 348 (emphasis added) (affirming summary judgment for hospital employer and finding the "'mere citation' to [a] regulation without a demonstration of how the reported conduct violated it cannot form the basis for a wrongful discharge action.").  Therefore, Plaintiff's own subjective view that producer's actions violated the IPA does not demonstrate the actions allegedly did, indeed, violate the IPA.

The Western District Court of Appeals recently applied *Margiotta* in a case involving a doctor reporting a colleague for allegedly ordering unnecessary consults.  *See generally Yerra v. Mercy Clinic Springfield Communities*, 536 S.W.3d 348 (Mo. Ct. App. 2017).  The plaintiff in *Yerra* was terminated later for performance issues, including an incident in the intensive care unit.  *Id*. at 352.   The Court of Appeals overturned a plaintiff's jury verdict with instructions to enter an award in the hospital's favor.  *Id*. at 351.

In doing so, the *Yerra* Court found the plaintiff's "reasonable belief" of a violation was irrelevant.  *Id*. (citing *Margiotta*, 315 S.W.3d at 348).  Thus, to establish a whistleblowing claim, Plaintiff must show the conduct in question actually violated the IPA; whether he thought the actions violated the IPA is irrelevant.  *Id*. at 352 ("if the reported act was *not* illegal . . . (the plaintiff just *thought* so), it would be 100% liability for 0% causation or reprehensible employer behavior" which the court would not allow).  Plaintiff's subjective belief of what is lawful or unlawful is irrelevant because the producers must have *actually* engaged in unlawful conduct to protect Plaintiff's employment.  Accordingly, Plaintiff's claim must fail.

### 3.       The Alleged Conduct Was Not Illegal.

Even if Plaintiff could establish a whistleblowing claim for reporting actions he believed

occurred, but did not witness himself, his claim still fails as a matter of law.  To maintain a valid

whistleblowing claim, the plaintiff must have reported *illegal* conduct.  *Margiotta*, 315 S.W.3d at

346 (whistleblowing claim requires reporting serious misconduct constituting a violation of the

law).  None of the alleged conduct violates the IPA because no unlicensed producer sold,

solicited, or negotiated EB products.  The IPA defines these terms as:

> (12) "Negotiate", the act of conferring directly with or offering advice directly to a purchaser or prospective purchaser of a particular contract of insurance concerning any of the substantive benefits, terms or conditions of the contract, provided that the person engaged in that act either sells insurance or obtains insurance from insurers for purchasers; . . .

> (15) "Sell", to exchange a contract of insurance by any means, for money or its equivalent, on behalf of an insurance company;

> (16) "Solicit", attempting to sell insurance or asking or urging a person to apply for a particular kind of insurance from a particular company; . . . .

RSMo. §375.012.  The Missouri Code of State Regulations provides further guidance by citing

activities included and excluded by the IPA's definition of selling, soliciting, or negotiating.  *See*

20 C.S.R. 700-1.020.  The CSR clarifies:

- Negotiating does <u>not</u> include "communicating with the policyholder or prospective policyholder in order to obtain factual information necessary for an insurance producer to complete a review."  20 C.S.R. 700-1.020(2)(C).
- Selling does <u>not</u> include "receiving requests for coverage for transmittal to a licensed insurance producer," or "preparing an application for insurance pursuant to instructions" of a licensed producer.  20 C.S.R. 700-1.020(3)(C).
- Soliciting does <u>not</u> include conversations where the terms of an insurance contract are not discussed (include conversations "disseminating buyer's guides, applications for coverage, coverage selection forms, or other similar forms"), scheduling appointments, or receiving information to provide to a licensed producer.  20 C.S.R. 700-1.020(1)(C).

Further, though an unlicensed person may not receive commissions for "selling,

soliciting, or negotiating" insurance, he *may* receive commissions so long as his activities do not

fall within the definitions of "sell, solicit, or negotiate."  RSMo. §375.076.

AP's Commission Splits Policy reaffirms each producer's obligations under the IPA.

6

New business relating to the originating producer's focus area did not require a commission split. However, new business outside of the originating producer's specialty required "team selling" with a producer specializing in the focus area of the new business.  An exception was made for new business below $5,000; in that circumstance, the originating producer was not required to team sell the business if it was below $5,000 and the originating producer was licensed in that line of insurance, irrespective of his focus group.

<strong>i.      Mr. Frechmann did not engage in unlawful conduct.</strong>

According to Plaintiff, Mr. Frechmann engaged in illegal conduct by discussing employee benefits coverage with Lanter Distributing, Liviara, Total Access Urgent Care, Granny 8 Mortgage, and an unnamed business in Springfield, Missouri and receiving commissions for Lanter's business. First, Plaintiff fails to identify what illegal conduct Mr. Frechmann took with respect to Lanter; his sole basis for stating Mr. Frechmann acted illegally is because "something had to happen" for Lanter to become a client.  Contrary to Plaintiff's bare accusations, Mr. Frechmann and an employee benefits ("EB") producer, Chase Butler, were the relationship contacts for Lanter.  Lanter came initially to AP for its property and casualty ("P&C") needs and subsequently hired AP to handle their EB business.  In fact, AP's EB producers managed the EB aspects of Lanter's account, not Mr. Frechmann as Plaintiff had assumed.  Additionally, Mr. Frechmann's receipt of commissions for Lanter's business did not violate the IPA because there is no evidence Mr. Frechmann engaged in selling, negotiating, or soliciting the business.  RSMo. §375.076.4.  Plaintiff's failure to identify any wrongful conduct by Mr. Frechmann eliminates any argument that Mr. Frechmann's actions relating to the Lanter account support his whistleblowing claim. *Margiotta*, 315 S.W.3d at 346.

Next, Plaintiff alleged Mr. Frechmann had a conversation with Liviara regarding AP's

7

EB capabilities before Plaintiff took over the EB work.  Plaintiff testified the conversation he believes Mr. Frechmann had with Liviara could have been a general conversation and there would be nothing illegal about such a conversation, though it could have been "improper." However, Plaintiff was not a party to Mr. Frechmann's conversations with Liviara. Unbeknownst to Plaintiff, Liviara used AP for their P&C needs and reached out to Mr. Frechmann to assist with their EB needs.  Mr.  Frechmann then reached out to Plaintiff – who was new to AP at the time – to present to Liviara, which Plaintiff did.  "Dispensing brochures and other general information, so long as there is no conversation relating to the terms of an insurance contract" and "communicating with [the] prospective policy holder in order to obtain factual information necessary for the producer to complete a review" does not violate the IPA. 20 C.S.R. 700-1.020(1)(C)(1), (2)(C).  Therefore, Mr. Frechmann's activities with Liviara were wholly lawful.

Third, Plaintiff accuses Mr. Frechmann of illegally discussing self-funded plan options with Total Access (though Plaintiff had no firsthand knowledge of such a conversation).  His allegations are vague and, without further detail, it is impossible to ascertain whether Frechmann's Total Access conversation violated the IPA.  However, Plaintiff cannot provide further detail because he was not a party to the conversation.  Lynne Scott, an EB-licensed producer, not Mr. Frechmann, spoke with Total Access about self-funding.  Irrespective of who spoke to Total Access about self-funding, conversations about self-funding do not necessarily implicate an insurance sale that would trigger the IPA and there is no evidence to suggest such a sale was forthcoming. *Boeing Co. v. Thurmon*, No. 4:09 CV 1456 DDN, 2009 WL 4782085, at *6 (E.D. Mo. Dec. 7, 2009) (plans can be self-funded, self-insured, fully insured or some combination thereof).  Finally, Mr. Frechmann properly utilized AP's EB producers to manage

Total Access EB business.  Those producers kept Mr. Frechmann informed but were also responsible for directly contacting Total Access for information necessary to service its EB needs.  Mr. Frechmann's only role was to set up meetings and keep track of communications. Accordingly, Mr. Frechmann complied with the law in all respects.

With respect to the Granny 8 accusation, Plaintiff alleged Mr. Frechmann communicated with Granny 8 about disability insurance and AP's capabilities to provide that type of insurance. Plaintiff's own recitation of the events surrounding the Granny 8 deal contradicts his assertions that Mr. Frechmann acted illegally.  Plaintiff acknowledged Mr. Frechmann terminated the conversation when Granny 8 wanted more technical information, noting he would bring in an EB producer to answer those questions.  Mr. Frechmann selected Plaintiff to continue the dialogue, which Plaintiff did.  General discussions about AP's capabilities do not amount to IPA violations.  20 C.S.R.  700-1.020.  Consequently, there is nothing unlawful about Mr. Frechmann's actions with respect to Granny 8.  *Id*.

Plaintiff also alleged Mr. Frechmann's pitch to a company in Springfield discussed EB. However, Plaintiff's assumption is based on a conversation he had with Mr. Frechmann, not Plaintiff's knowledge of what Mr. Frechmann did or did not do with that company.  The IPA does not prohibit Mr. Frechmann from discussing the scope of EB with Plaintiff.  It only prohibits Mr. Frechmann actually selling, soliciting, or negotiating to prospective or current clients.  RSMo. §375.014.  Thus, nothing about Mr. Frechmann's actions implicates the IPA.

Mr. Frechmann brought in an EB-licensed producer for each of these deals:  Plaintiff himself took over two deals (Liviara and Granny 8) and Plaintiff was aware Mr. Butler and another producer assisted with the remaining deals where presentations occurred.  Accordingly, Mr. Frechmann did not act unlawfully and Plaintiff's assertions to the contrary are incorrect.

### ii.     Mr. Breslin did not engage in unlawful conduct.

Plaintiff alleged Mr. Breslin engaged in unlawful activity with respect to the sale, negotiation, or solicitation of EB.  Plaintiff was involved in the Great Clips deals with Mr. Breslin.   However, Plaintiff asserts Mr. Breslin violated the IPA by discussing AP's compensation and coverage with Great Clips and receiving 50% of the commissions on an EB deal when he was not licensed in EB pursuant to AP's Commission Splits Policy.  Notably, Plaintiff admitted he was not a party to the alleged conversations and could not explain what coverage discussions were had.  General conversations do not violate the IPA.  20 C.S.R. 700-1.020.  Moreover, discussions of AP's compensation do not violate the IPA.  *Id*.  Rather, it is discussions of the policy rates or premiums that would violate the IPA, which Plaintiff testified did not occur.  *Id*.  Additionally, Mr. Breslin's earned commissions do not violate the IPA because he did not solicit, sell, or negotiate the business.  RSMo. §375.076.4.

Next, Plaintiff conceded Mr. Breslin's communications with Slider House would have, at most, "in a small way" bordered on illegal conduct because Mr. Breslin allegedly discussed AP's capabilities to provide plans compliant with federal statutes, but this is not true.  Again, Breslin's general conversation is unequivocally permitted by the regulations and Plaintiff admitted such general conversations could be legal.  20 C.S.R. 700-1.020.  Plaintiff was involved in the Slider House pitch and testified that he did not observe illegal conduct.

Finally, Plaintiff speculates that Mr. Breslin must have violated the IPA in his contact with Bank of Washington because of coding in AP's computer system.  This vague allegation of presumed illegal activity cannot serve as the basis of a whistleblowing claim.  *Yerra*, 536 S.W.3d at 352; *Margiotta*, 315 S.W.3d at 348.  Mr. Breslin's email communications with Plaintiff regarding the Bank of Washington prospect clearly indicate further conversations involving

10

Plaintiff's EB expertise were forthcoming.  20 C.S.R. 700-1.020.  Accordingly, Breslin complied
with the IPA.

### iii.        Mr. Fox did not engage in unlawful conduct.

Finally, Plaintiff testified as to only one client he believes Mr. Fox may have interacted
with in an unlawful manner.  Niemeyer believed that because he calculated different figures
concerning premiums and brokerage compensation for Mr. Fox, that Mr. Fox then had an
unlawful conversation with the client, Natoli Engineering.  However, Plaintiff admitted that he
was not involved in any of the conversations with Natoli by way of telephone or an in-person
meeting.  Furthermore, Plaintiff acknowledged that he did not "know for a fact" what Mr. Fox
said to Natoli during his conversations.  Plaintiff has no evidence that Mr. Fox actually engaged
in unlawful activity.

As the producers Plaintiff complained of did not actually engage in unlawful conduct,
Plaintiff's claim must fail.

### B.        Plaintiff Did Not Blow the Whistle.

In whistleblower wrongful discharge claims, "it is axiomatic that the at-will employee
*report* or '*blow the whistle*' to the proper authorities, which, depending on the circumstances,
would include the employer, 'internal whistleblowing,' and/or a third-party authority, 'external
whistleblowing.'" *Drummond v. Land Learning Found.*, 358 S.W.3d 167, 171 (Mo. Ct. App.
2011) (emphasis added).  Such claims require a plaintiff to actually "report[ ] to superiors or to
public authorities serious misconduct that constitutes a violation of the law." *Margiotta*, 315
S.W.3d at 346-47.

This Court narrowed the alleged complaints made by Plaintiff to two in-person
conversations with Mr. Hejna.  Doc. 65, p. 15.  The first in-person "report" to Mr. Hejna,

occurred in January 2017 – more than seven months before Plaintiff's termination.  During that conversation, Plaintiff allegedly informed Mr. Hejna that Mr. Fox, Mr. Frechmann, and Mr. Breslin were soliciting business without licenses and that Mr. Breslin and Mr. Frechmann received commissions on EB deals.  However, Plaintiff did not provide additional detail or information about the allegedly illegal activities, and so his communication to Mr. Hejna did not constitute a report of "serious misconduct that constitutes a violation of the law." *Margiotta*, 315 S.W.3d at 346-47.  Furthermore, receiving commissions on EB deals does not violate the law, and so Plaintiff's complaint in that regard does not constitute a violation of the law so as to establish a "report" for which he would receive job protection as a whistleblower.

Furthermore, this alleged "report" occurred nearly seven months prior to Plaintiff's termination.  As such, there was a significant gap in time between Plaintiff's "report" and his termination, which infers that his termination was wholly unrelated to this "report."  Indeed, even a mere three months between a complaint of illegal activity or refusal to engage in illegal activity and a termination is not enough to establish causation to support a wrongful discharge claim. *Hess v. Sanofi-Synthelabo Inc.*, 503 F. Supp. 2d 1178, 1188 (E.D. Mo. 2007) (applying Missouri law and finding plaintiff failed to establish causation where three months elapsed between the plaintiff's refusal to perform an illegal act and the plaintiff's termination, stating "[t]his temporal lack of proximity suggests that there is no nexus between Plaintiff's alleged protected activity and his discharge").  "A gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive." *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 633 (8th Cir. 2005); *see, e.g.*, *Denn v. CSL Plasma, Inc.*, 816 F.3d 1027, 1036-37 (8th Cir. 2016) (holding the plaintiff failed to establish his discrimination complaint was a factor contributing to his termination because "more than seven weeks of work

separated [plaintiff's] complaint and his eventual firing"); *Shanklin v. Fitzgerald*, 397 F.3d 596, 604 (8th Cir. 2005) (finding the plaintiff failed to establish a causal connection where ten months elapsed between the plaintiff's discrimination charge and her subsequent discharge).

Plaintiff's second in-person alleged "report" occurred on February 15, 2017, and it fails to constitute "blowing the whistle" for the same reasons as the first – it did not contain the level of detail necessary to establish serious misconduct in violation of the law and it took place six months prior to his termination.  The context of this alleged "report" is also incredibly important. Mr. Hejna and Plaintiff met on February 15, 2017 because Mr. Hejna called the meeting to discuss Plaintiff's attitude and failure to be a team player.  Mr. Hejna warned Plaintiff that his failure to change his "attitude and approach to communicating with" AP employees would result in his termination.  In lieu of accepting personal responsibility for his conduct at work, Plaintiff deflected by allegedly informing Mr. Hejna that certain producers were receiving commissions on EB deals, namely Mr. Breslin and Mr. Frechmann.  Plaintiff clearly had no intention to "blow the whistle" during this meeting because he was deflecting attention away from his own bad behavior.  Again, as discussed above, there was no illegal conduct being reported and consequently that conversation does not constitute a report for purposes of Plaintiff's whistleblowing claim.

Further, this "report" is too remote in time to support a whistleblower claim because it occurred six months before his termination.  *Denn*, 816 F.3d at 1036-37; *Hesse*, 394 F.3d at 633; *Shanklin*, 397 F.3d at 604; *Hess*, 503 F. Supp. 2d at 1188; *Margiotta*, 315 S.W.3d at 346-47; *Fleshner*, 304 S.W.3d at 94-95.  There was no report of alleged illegal activity from February 15, 2017 through the time of his termination on August 18, 2017.  Further, there was no adverse action taken against him after these alleged complaints to Mr. Hejna.  Accordingly, Plaintiff has

not established that he sufficiently blew the whistle on his colleagues so as to invoke job protection as a whistleblower.

### C.    Plaintiff's Own Abrasive and Insubordinate Conduct Caused His Termination.

Plaintiff's alleged complaints were not the impetus for his termination.  Instead, Plaintiff's combative conduct with respect to AP's clients and employees, as well as his insubordinate behavior, were the sole causes of his termination.  In order to prevail on his whistleblower claim, Plaintiff must prove that "the exclusive cause of his termination was the report of violations." *Frevert v. Ford Motor Co.*, No. 08-0385-CV-W-ODS, 2009 WL 1542715, at *4 (W.D. Mo. June 1, 2009), *aff'd*, 614 F.3d 466 (8th Cir. 2010) (finding plaintiff's reporting was not "part, much less the exclusive cause, of the decision to terminate his employment").

Here, Plaintiff was terminated because of his abrasive, controlling, and demeaning attitude toward AP employees and clients, and because of his refusal to be a team player.  In fact, Plaintiff was coached three times by February 15, 2017 to improve his conduct and he was warned that the failure to change would end in his termination.  Despite this warning, Plaintiff's colleagues continued to report Plaintiff for inappropriate conduct.  Mr. Hejna finally had enough when it was reported that Plaintiff was critical of AP, its employees, its sales practices, and Mr. Hejna's ability to operate AP.  After  a meeting of with other senior AP employees, it was decided that Plaintiff's behavior compelled termination.  Curiously, Plaintiff does not deny the inappropriate conduct of which he was accused.  Because AP cannot, and should not, employ insurance producers who engage in such egregious rude, condescending, confrontational, and know-it-all behavior, the totality of Plaintiff's own conduct led to his termination.

## IV. CONCLUSION

Plaintiff cited no illegal activities that he witnessed firsthand and, even if he had, the alleged wrongful acts did not violate the IPA. Further, Plaintiff failed to properly report the conduct to his supervisor and his bad attitude, not the alleged reporting, led to his termination. Accordingly, his whistleblowing claim fails as a matter of law.

Respectfully submitted,

/s/ Charles E. Reis, IV
Charles E. Reis, IV #32535 MO
Ashley A. Diaz #67335 MO
LITTLER MENDELSON, P.C.
600 Washington Avenue, Suite 900
St. Louis, MO 63101
Telephone: 314.659.2000
Facsimile: 314.659.2099
creis@littler.com
aadiaz@littler.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of March, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system to be served by operation of the Court's electronic filing system upon all attorneys of record.

/s/ Charles E. Reis, IV

FIRMWIDE:163358790.3 098896.1002

15